IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| MARSHALL BROWN, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Civil Action No. 21-491-GBW |
| | : | |
| BRIAN EMIG, Warden, and | : | |
| ATTORNEY GENERAL OF THE | : | |
| STATE OF DELAWARE, | : | |
| | : | |
| Respondents.[1] | : | |
| | : | |


Marshall Brown. *Pro se* Petitioner.

Brian L. Arban, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware. Attorney for Respondents.


## **MEMORANDUM OPINION[2]**


September 18, 2024
Wilmington, Delaware

---

[1] The Court has substituted Warden Brian Emig for former Warden Robert May, an original party to this case. *See* Fed. R. Civ. P. 25(d).

[2] This case was re-assigned to the undersigned's docket on September 8, 2022.

Williams, District Judge:

Presently pending before the Court is Petitioner Marshall Brown's

("Petitioner") amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C.

§ 2254.  (D.I. 2; D.I. 19; D.I. 20)  The State filed an Answer in opposition.  (D.I.

25)  For the reasons discussed, the Court will deny the Petition.

## I.   BACKGROUND

> On May 26, 2015, Karen Fahey ("Karen") was awakened by bells ringing on the back door of the Townsend, Delaware home she shared with her mother, her daughter, her daughter's boyfriend, and her two grandchildren. When she turned on a light, she was alarmed to see someone dressed all in black in her backyard. She yelled for everyone to get up and for her daughter to call 9-1-1. Grabbing her gun from her bedroom, she ran back to her kitchen.  She heard pounding on the door, the door bursting open, and saw somebody jump into the house. She took a shot and the intruders opened fire, hitting her in the leg. After her gun jammed, she grabbed her granddaughter, ran back into the bedroom and threw a blanket over her.  Someone ran into her room, grabbing her, pounding her head down, and telling her to stay down while yelling, "Police, police, get down." Karen could hear her daughter in the other room yelling, "Give me my baby." After the intruder had gone into and out of the bedroom screaming, "Give me the money. Give me the money," somebody yelled that the police were coming, and all of the intruders fled.  Karen described the intruders as wearing all black clothing with "POLICE" written across their shirts and wearing masks and gloves.

> Stacie Fahey ("Stacie") was living in the home as well. She lived there with her mother, Karen, her grandmother, her boyfriend and their two children.  On the night of the home invasion, she was awakened by her mother

screaming, "They're here, they're here, call 9-1-1." She called 9-1-1 from her cell phone and threw the phone into her desk in the bedroom. She and her boyfriend tried to barricade the bedroom door with the desk, but the intruders broke down the door, dragged her boyfriend out of a closet, and took him into the kitchen. There, they beat him while demanding money. Stacie was sitting on the bed, tightly holding onto her one-year-old son when one of the men came into the bedroom and squatted down on his knees to her level. He put a gun to her head and demanded money. The man then took her son from her, grabbed him by the leg, hung him upside down, put a gun to his head, and said he was going to kill her son if she did not give him money. Eventually, the man threw her baby on the bed and fled with the others. Stacie testified that she got a good look at the eyes of the man who crouched in front of her and took her baby away from her, playing the look she had of his eyes back in her head every day. She testified that she looked at the man's eyes from about the distance between her and the microphone on the witness stand. She said th[at Petitioner's] eyes looked like that man's eyes. The incident ended when someone yelled that the police were coming and everyone fled the house.

When police arrived and began looking for evidence, they found a backpack, which contained a roll of duct tape and a pink stun gun, on the side of the driveway. A forensic latent print examiner later matched a thumbprint found on the duct tape to [Petitioner]. DNA collected from the tightening strap of the backpack was consistent with being from a mixture of at least three individuals, including [Petitioner], and excluding Karen, Stacie, and Stacie's boyfriend.

Helen McKamey lived in the same house as her daughter, Karen, and her granddaughter, Stacie. On May 14th, she said three men in a car came down the lane leading from the road to her house. The passenger asked if she had any hay for sale, despite there being no signs indicating hay for

2

sale. At trial, McKamey positively identified [Petitioner] as being the driver of the vehicle. Karen was home with her mother when this incident occurred. She observed her mother outside talking to some people in a blue Lincoln. Because she thought the encounter was strange, she got the vehicle's license plate number. The license plate came back to a vehicle registered to Jennifer Brown of 2509 North Washington Street in Wilmington. [Petitioner] listed the same address. Jennifer Brown is [Petitioner's] mother.

*State v. Brown*, 2019 WL 5681524, at *3 (Del. Super. Ct. Oct. 31, 2019).

In November 2015, a New Castle County grand jury indicted Petitioner on home invasion, two counts of first degree assault, first degree burglary, first degree reckless endangering, three counts of first degree robbery, eight counts of possession of a firearm during the commission of a felony("PFDCF"), eight counts of wearing a disguise during the commission of a felony ("WDDCF"), second degree conspiracy, endangering the welfare of a child, and possession of a firearm by a person prohibited ("PFBPP"). (D.I. 26-4 at 15-27)  The Superior Court severed the PFBPP charge prior to trial. (D.I. 26-1 at Entry No. 30)  The case proceeded to a jury trial in the Superior Court on April 12, 2016. (D.I. 26-1 at Entry No. 34)  The Superior Court declared a mistrial when the jury was unable to reach a unanimous verdict. *See Brown v. State*, 182 A.3d 114 (Table), 2018 WL 1313036, at *1 (Del. Mar. 13, 2018).  During his retrial in 2017, a Superior Court jury found Petitioner guilty of all charges except for PFBPP. *See id.*  On June 30,

3

2017, the Superior Court sentenced Petitioner as a habitual offender to life plus 388 years in prison. (D.I. 26-4 at 86-96)  Petitioner appealed, and the Delaware Supreme Court affirmed his convictions and sentence on March 13, 2018.  *See Brown,* 2018 WL 1313036, at *1.

On August 21, 2018, Petitioner filed a *pro se* motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion") and a motion to appoint counsel.  (D.I. 26-1 at Entry Nos. 80, 83)  The Superior Court appointed postconviction counsel, who subsequently filed an amended Rule 61 motion.  (D.I. 26-1 at Entry Nos. 84, 95)  On October 31, 2019, the Superior Court denied Petitioner's amended Rule 61 motion.  *See Brown,* 2019 WL 5681524, at *6.  The Delaware Supreme Court affirmed that judgment on June 15, 2020.  *See Brown v. State*, 234 A.3d 160 (Table), 2020 WL 3250235, at *1 (Del. June 15, 2020).

## II.    GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).  Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground

4

that he is in custody in violation of the Constitution or laws or treaties of the

United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural

requirements and standards for analyzing the merits of a habeas petition in order to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are

given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693

(2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief

unless the petitioner has exhausted all means of available relief under state law.

*See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999);

*Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states in pertinent part:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in
> the courts of the State; or
>
> (B)(i) there is an absence of available State corrective
> process; or (ii) circumstances exist that render such
> process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of

comity, gives "state courts one full opportunity to resolve any constitutional issues

by invoking one complete round of the State's established appellate review

process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples*, 489 U.S. 346, 351 (1989). If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims

6

unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[3] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S.

---

[3]*Murray*, 477 U.S. at 496.

614, 623 (1998); *Murray*, 477 U.S. at 496.  A petitioner establishes actual

innocence by asserting "new reliable evidence—whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -

that was not presented at trial," showing that no reasonable juror would have voted

to find the petitioner guilty beyond a reasonable doubt.  *See Hubbard v. Pinchak*,

378 F.3d 333, 339-40 (3d Cir. 2004).

### C.  Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the

federal court must review the claim under the deferential standard contained in 28

U.S.C. § 2254(d).  Pursuant to § 2254(d), federal habeas relief may only be granted

if the state court's decision was "contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court

of the United States," or the state court's decision was an unreasonable

determination of the facts based on the evidence adduced in the trial.  28 U.S.C. §

2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*,

250 F.3d 203, 210 (3d Cir. 2001).  A claim has been "adjudicated on the merits"

for the purposes of § 2254(d) if the state court decision finally resolved the claim

on the basis of its substance, rather than on a procedural or some other ground.  *See*

*Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).  The deferential standard of §

2254(d) applies even "when a state court's order is unaccompanied by an opinion

8

explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

When reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## D.  Ineffective Assistance of Counsel

In order to establish a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance.

*Strickland*, 466 U.S. at 688.  Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.  Under the second *Strickland* prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96.  A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688.  In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987).  A court may choose to address the prejudice prong before the deficient performance prong, and may reject an ineffectiveness claim solely on the ground that the movant was not prejudiced. *See Strickland*, 466 U.S. at 668.

The same *Strickland* standard applies to a petitioner's ineffective assistance of appellate counsel claim. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  "[I]t is a well-established principle that counsel decides which issues to pursue on appeal,"[4] and appellate counsel is not required to raise every possible non-frivolous issue. *See Smith*, 528 U.S. at 272;  *Smith v. Murray*, 477 U.S. 527, 536 (1986)

---

[4]*Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996).

(The "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence is the hallmark of effective appellate advocacy."); *Jones v. Barnes*, 463 U.S. 745 (1983); *Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999) (stating counsel is afforded reasonable selectivity in deciding which claims to raise without specter of being labeled ineffective).  As a general rule, when an ineffective assistance of counsel claim is premised on appellate counsel's failure to raise an issue on appeal, the deficient performance prong of *Strickland* is satisfied "only when the "ignored issues are clearly stronger than those presented."  *Smith*, 528 U.S. at 288.  In order to establish prejudice, a petitioner must demonstrate that the appellate court "would have likely reversed and ordered a remand had the issue been raised on direct appeal."  *United States v. Mannino*, 212 F.3d 835, 844 (3d Cir. 2000).

## III.   DISCUSSION

Petitioner's timely-filed amended Petition asserts the following seven Claims for relief: (1) the Superior Court violated Petitioner's due process rights by admitting into evidence in-court identifications made under unnecessarily suggestive circumstances (D.I. 2 at 20-33); (2) appellate counsel provided ineffective assistance ("IAAC") by failing to appeal the denial of his motion for judgment of acquittal (D.I. 2 at 34-49); (3) Petitioner is actually innocent (D.I. 19 at 10-12); (4) there was insufficient evidence to support his convictions (D.I. 19 at

11

24-25); (5) trial counsel provided ineffective assistance ("IATC") by failing to seek

a jury instruction on in-court identifications (D.I. 19 at 23-24); (6) the Delaware

Attorney General's Office had an insurmountable conflict of interest (D.I. 20 at 1-

5); and (7) cumulative error (D.I. 19 at 25-26).

### A.  Claim One: Admission of Suggestive In-Court Identifications Violated Petitioner's Due Process Rights

On May 27, 2015, the day after the home invasion, Detective Grassi

interviewed Stacie and showed her a photo lineup.  (D.I. 26-4 at 60, 62)  Stacie

could not identify the perpetrators of the home invasion and said that she had only

seen their eyes, but she identified Petitioner as the person who had previously

committed a robbery on April 30, 2015.  (*Id.* at 61-62)  Detective Grassi also

showed McKamey a photo lineup during her police interview on May 27, 2015.

(*Id.* at 66)  McKamey indicated that Petitioner possibly looked like the driver who

had visited her house on May 14, 2015 and had inquired about purchasing hay.

(*Id.*)

On July 21, 2015, Detective Grassi conducted another photo lineup with

Stacie because he had received information about another possible suspect;

Petitioner was not included in that lineup.  (D.I. 26-4 at 62, 65)  Stacie picked

someone she believed was the person who stood in her room during the home

12

invasion but she said that, on a scale of one to ten, she only had a confidence level of four about the identification.  (*Id.* at 63)

Stacie was shown another photo lineup while preparing for Petitioner's first trial.  (D.I. 26-4 at 51)  She identified someone other than Petitioner as the perpetrator.  (*Id.*)  Detective Grassi asked if she was certain about her selection and, after examining the lineup again, Stacie identified Petitioner and said she had picked the wrong person initially.  (*Id.*)

The day before Petitioner's first trial, the State disclosed Stacie's inconsistent identification to the defense.  (D.I. 26-17 at 9)  Petitioner moved to dismiss the charges, arguing that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963) and had failed to preserve evidence.  (D.I. 26-1 at Entry No. 27) The Superior Court held a pretrial evidentiary hearing.  At the hearing, Stacie identified Petitioner as the person who held her at gunpoint during the home invasion, explaining that she recognized his big and bulky eyes.  (D.I. 26-17 at 3) The Superior Court denied the motion to dismiss and rejected Petitioner's contention about the State's failure to preserve evidence, although it noted that the State had arguably violated *Brady* by delaying the disclosure of Stacie's inconsistent identification.  (D.I. 26-17 at 12-13)  Nevertheless, the Superior Court found that Petitioner was not prejudiced from that delay.  (D.I. 26-17 at 13)

13

At Petitioner's first trial, through Detective Grassi's testimony, the State presented McKamey's out-of-court identification of Petitioner as the person who had visited her property on May 14, 2015. (D.I. 26-18 at 11-13)  Stacie and McKamey testified during the first day of Petitioner's first trial, but the State did not ask them to identify Petitioner in the courtroom.  (*See* D.I. 25 at 20; D.I. 26-3 at 6)  Stacie and McKamey were sequestered after testifying.  On the last day of Petitioner's trial, the Superior Court granted the State's unopposed request to lift the sequestration order; thereafter, both witnesses sat in the courtroom for a portion of the final day of Petitioner's first trial.  (D.I. 25-18 at 9)

Before his retrial, Petitioner filed a motion to exclude in-court identifications of the State's witnesses – including those from Stacie and McKamey – on the basis that "any first time in-court identifications will be the result of inherently suggestive proceedings (attendance at first trial) and implicate his due process rights." (D.I. 26-4 at 33)  The Superior Court conducted *voir dire* on the motion, during which Stacie, McKamey, and Detective Grassi testified.  (D.I. 26-4 at 59-67)  Stacie represented that she could identify Petitioner as the perpetrator of the home invasion based on his eyes. (D.I. 26-4 at 60)  Petitioner cross-examined Stacie about her prior inconsistent statement to police in which she said that she had not "really look[ed] at [the perpetrator's] eyes" and about her inability to identify the perpetrator during a police photo lineup on the day after the home

14

invasion.  (D.I. 26-4 at 61)  When questioned about her memory of Petitioner's

first trial, Stacie stated that she only saw Petitioner out of the corner of her eye

when she was on the witness stand, and that she only looked at the back of

Petitioner's head when she was sitting in the courtroom after the sequestration

order had been lifted.  (D.I. 26-4 at 64)

During the same *voir dire*, McKamey identified Petitioner as the person who

drove the Lincoln onto her property on May 14, 2015.  (D.I. 26-4 at 65)  Petitioner

cross-examined McKamey about her uncertainty when identifying Petitioner as the

driver during a prior police photo lineup.  (D.I. 26-4 at 66)  When questioned about

her memory of Petitioner's first trial, McKamey stated that she was able to see

Petitioner when she was on the witness stand, and that she only "looked over" at

Petitioner and did not stare at him when she was sitting in the courtroom after the

sequestration order had been lifted.  (D.I. 26-4 at 67)  The Superior Court asked

McKamey what she would have answered during the first trial if she had been

asked "to make an identification as to whether the person who [she] saw in the car

was in the courtroom." (D.I 26-4 at 67)  McKamey replied she "would have said

that was him." (*Id.*)

The Superior Court denied the motion to exclude in-court identifications,

ruling that the risk of unfair prejudice did not outweigh the probative value of the

identifications under Delaware Rule of Evidence 403.  (D.I. 26-4 at 69-70)  During

15

Petitioner's retrial, Stacie and McKamey provided in-court identifications of

Petitioner that were consistent with their testimony at the *voir dire*. (D.I. 26-4 at

72, 79)

In Claim One, Petitioner argues that the in-court identifications by Stacie

and McKamey during his retrial violated his due process rights because their

presence in the courtroom on the last day of his first trial amounted to an

impermissibly suggestive pretrial identification procedure. Petitioner presented the

same argument on direct appeal. Citing *Perry v New Hampshire*, 565 U.S. 228,

241 (2012), the Delaware Supreme Court denied Petitioner's argument as

meritless,[5] opining:

> Because the "primary aim of excluding identification
> evidence obtained under unnecessarily suggestive
> circumstances is to deter law enforcement use of improper
> procedures," and the police did not intentionally
> orchestrate the witnesses' observation of [Petitioner] at the
> first trial to procure an identification, the Superior Court
> correctly concluded that no constitutional violation
> occurred. Moreover, after hearing the witnesses' testimony
> during a pretrial hearing, the Superior Court thoughtfully
> balanced the probative value of the testimony against the
> danger of unfair prejudice under D.R.E. 403. Under the
> circumstances, allowing the challenged testimony was not
> an abuse of discretion.

_____

[5]Interestingly, on postconviction appeal, Petitioner cited *Perry* and acknowledged
that the issue as to whether Stacie and McKamey's in-court identifications during
his retrial violated his due process rights "had already been conclusively decided
by the United States Supreme Court at the time of appeal and not in [Petitioner's]
favor." (D.I. 26-9 at 38)

*Brown*, 2018 WL 1313036 at *1 (cleaned up).  Given the Delaware Supreme

Court's adjudication of the issue, Claim One will only warrant relief if the

Delaware Supreme Court's decision was either contrary to, or an unreasonable

application of, clearly established federal law.

> As recently summarized by the Third Circuit:
>
>> Following a line of eyewitness identification cases, the Supreme Court in *[Neil v.]Biggers*, clarified that the admission of identification evidence offends due process only if the evidence meets two criteria. First, the evidence must be "so impermissibly suggestive as to give rise to a very substantial likelihood of *irreparable misidentification.*" Second, if the evidence is impermissibly suggestive, it must also be unreliable. The two criteria work in tandem, even though the admissibility of identification evidence often hinges on reliability. Put differently, due process requires the suppression of an identification only if it was obtained pursuant to a suggestive process that in turn raises serious questions about the reliability of the resulting identification.

*United States v. Hall*, 28 F.4th 445, 453–54 (3d Cir. 2022) (cleaned up).  In

*Biggers*, the Supreme Court set out a two-step inquiry for assessing the

constitutionality of a trial court's decision to admit out-of-court identifications.

*See Neil v. Biggers*, 409 U.S. 188, 196-200 (1972).  First, the court must determine

if the challenged pre-trial identification procedure was impermissibly suggestive.

*See id.* at 196-97; *Simmons v. United States*, 390 U.S. 377, 384 (1968).  If the first

step is answered affirmatively, then the court must determine whether, under the

totality of the circumstances using five factors set forth in *Biggers*,[6] the

identification was nonetheless reliable. *See Biggers*, 409 U.S. at 198-200; *Perry*,

565 U.S. at 239-40. Conversely, if the reviewing court finds that the identification

procedure was not unduly suggestive, then the admission of the out-of-court

identification did not violate the defendant's due process rights. In such cases, the

"reliability of properly admitted eyewitness identification, like the other parts of

the prosecution's case, is a matter for the jury." *Foster v. California*, 394 U.S.

440, 443 n.2 (1969); *see Perry*, 565 U.S. at 240-42.

Prior to *Perry*, the Supreme Court decisions analyzing due process claims

based on the suggestiveness of pretrial identifications involved out-of-court pre-

trial identification procedures that were arranged by law enforcement personnel.[7]

*See Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (police-arranged hospital show-

up was necessary and did not present due process violation under the totality of

circumstances); *Simmons*, 390 U.S. at 380-81 (rejecting claim that F.B.I. showing

of multiple snapshots of defendant with others was so unnecessarily suggestive and

---

[6]The factors to be considered in the "totality of the circumstances" analysis include
"the opportunity of the witness to view the criminal at the time of the crime, the
witness' degree of attention, the accuracy of his prior description of the criminal,
the level of certainty demonstrated at the confrontation, and the time between the
crime and the confrontation." *Biggers,* 409 U.S. at 199-200.

[7]Notably, as the Supreme Court observed in *Sexton v. Beaudreaux*, 585 U.S. 961.
966 (2018), the Court "has held that pretrial identification procedures violated the
Due Process Clause only once, in *Foster v. California*, 394 U.S. 440 (1969)."

conducive to misidentification by witnesses as to deny due process of law); *Foster*, 394 U.S. at 443 (suggestive lineup procedures used by police "so undermined the reliability of the eyewitness identification as to violate due process"); *Biggers*, 409 U.S. at 198-201 (notwithstanding claim that show-up identification at police station was unnecessarily suggestive, it was properly allowed to go to jury, where totality of circumstances showed that victim's identification was reliable); *Manson v. Brathwaite*, 432 U.S. 98 (1977) (despite unnecessary display by police of single photograph of state prisoners to undercover police officer, admission of officer's identification did not result in due process violation because evidence showed witness's ability to make accurate identification).   In *Perry*, however, the Supreme Court was presented with a due process claim which did not involve a "lineup, showup, or photograph array" allegedly "infected [with] improper police influence." *Perry*, 565 U.S. at 232-33.   Instead, the eyewitness identification of the petitioner arose under "suggestive circumstances" which the police had not arranged. *Id.* at 232.   The Supreme Court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement,"[8] explaining:

---

[8]*Perry*, 565 U.S. at 248.

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. [...] Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Perry*, 565 U.S. at 232-33.

Here, Petitioner does not challenge the constitutionality of Stacie's and McKamey's out-of-court identifications that were arranged by the police. Petitioner also does not allege, and nothing in the record indicates, that the police orchestrated the witnesses' observation of him in the courtroom during his first trial. And, to the extent Petitioner may be challenging the in-court identifications as the first time Stacie and McAmvey identified Petitioner live, there is no Supreme Court precedent extending the protections of *Biggers* and its progeny to cases where the eyewitness first identifies a defendant at trial. *See, e.g., Lunsford v. Adm'r New Jersey State Prison*, 2024 WL 3356993, at *2 (3d Cir. July 10, 2024) ("An in-court identification can be suppressed under the Due Process Clause only if it was influenced by a suppressible out-of-court identification."). Consequently,

the Court cannot conclude that the Delaware Supreme Court's denial of Claim One

was contrary to, or an unreasonable application of, the clearly established federal

law governing claims alleging due process concerns with in-court witness

identifications.[9]  *See White v. Woodall*, 572 U.S. 415, 426 (2014) (explicitly

---

[9]Citing *United States v. Jones*, 785 F. App'x 68, 72-73 (3d Cir. Aug. 20, 2019), Petitioner asserts that the Delaware Supreme Court incorrectly focused on the absence of **police involvement** when rejecting his appellate argument regarding the impermissibly suggestive identifications. (D.I. 2 at 25)  According to Petitioner, determining whether the introduction of eyewitness identifications violated a defendant's due process rights "turns on" the presence of a "**state arranged identification procedure.**"  (*Id.*) (emphasis added)

The Court is not persuaded.  In *Jones*, the Third Circuit articulated the relevant inquiry after *Perry* as being whether the identifications were the result of an unnecessarily suggestive **state arranged** identification procedure without asking if the identifications were the result of improper "police involvement."  Importantly, however, the Third Circuit acknowledged that "*Perry* leaves unanswered what constitutes a state-arranged identification procedure," and concluded that "the state may be a but-for cause of the identification without conducting a state-arranged identification procedure." *Jones*, 785 F. App'x at 72- 73.

In this case, the Court views the State's act of asking the trial court to lift the sequestration order as, at most, constituting a "but-for" cause of the identification without rising to the level of a state-arranged identification procedure, because it was the trial court's act of lifting the sequestration order that resulted with Stacie and McAmvey being present in the courtroom during the last day of Petitioner's first trial.  Thus, even when analyzed under the Third Circuit's interpretation of *Perry*, the Court cannot conclude that the introduction of Stacie and McAmvey's in-court identifications violated Petitioner's due process rights.

rejecting the principle that a state court could be unreasonable in refusing to extend Supreme Court precedent to facts of a particular prisoner's case).

## B. Claim Two: Ineffective Assistance of Appellate Counsel

Following the close of the State's evidence at Petitioner's retrial, trial counsel moved for judgment of acquittal ("MJA"), arguing that there was insufficient evidence in the record "to show that [Petitioner] was there at the scene" when the crimes occurred. (D.I. 26-20 at 7); *see Brown*, 2019 WL 5681524, at *2. The Superior Court denied the MJA after reviewing the evidence "in a light most favorable to the State and all of the reasonable inferences to be drawn therefrom" and finding "a reasonable juror could find [Petitioner] guilty of the crimes charged." (D.I. 26-20 at 7) On direct appeal, appellate counsel did not re-assert the insufficient evidence argument and, instead, raised only one claim contending that the in-court identifications of Stacie and McKamey were impermissibly suggestive. *See Brown*, 2018 WL 1313036, at *1. The Delaware Supreme Court denied the identification argument as meritless.

Thereafter, in his Rule 61 motion, Petitioner argued that appellate counsel provided ineffective assistance by failing to include on direct appeal a challenge to the trial court's denial of the MJA. *See Brown*, 2019 WL 5681524, at *4. The Superior Court reviewed the evidence in the record and held that a rational trier of fact could have found that Petitioner was present at the scene when the crime

occurred. *See Brown*, 2019 WL 5681524, at *4-5. The Superior Court then

weighed Petitioner's sufficiency of the evidence issue raised in the MJA against

the identification issue that was raised on direct appeal, and held the Petitioner did

not establish appellate counsel's performance was deficient because he did not

show that the sufficiency of the evidence issue from the MJA was "clearly

stronger" than the identification issue raised on appeal. *Id.* at *5. The Delaware

Supreme Court affirmed the Superior Court's judgment "on the basis of and for the

reasons assigned by the Superior Court." *Brown*, 2020 WL 3250235, at *1.

Here, in Claim Two, Petitioner alleges that that appellate counsel should

have argued there was insufficient evidence to support his convictions and

contends appellate counsel provided ineffective assistance by failing to appeal the

Superior Court's denial of his MJA ("IAAC Claim"). Because the Delaware courts

adjudicated the merits of the instant IAAC Claim in Petitioner's Rule 61

proceeding, Claim Two will only warrant habeas relief if the Superior Court's

decision was either contrary to *Strickland*. [10]

---

[10]The Superior Court's denial of the instant Claim is the last state court decision
containing a reasoned analysis. Consequently, the Court references the Superior
Court's decision when analyzing Petitioner's instant IATC argument under §
2254(d). *See Wilson v. Sellers*, 584 U.S.122, 128 (2018) (reiterating that when a
higher court affirms a lower court's judgment without an opinion or other
explanation, federal habeas law employs a "look through" presumption and
assumes that the later unexplained order upholding a lower court's reasoned
judgment rests upon the same grounds as the lower court judgment).

Turning to the first prong of the § 2254(d)(1) inquiry in this proceeding, the Court notes that the Superior Court correctly cited and articulated the *Strickland* standard to be applied in the appellate context. *See Brown,* 2019 WL 5681524, at *5; *Williams,* 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court must also determine if the Superior Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. *See Harrington,* 562 U.S. at 105-06. When performing this inquiry, the Court must review the Superior Court's denial of Petitioner's IAAC allegation through a "doubly deferential" lens. *Id.* "[T]he question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland,* the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* And finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

24

The standard of review applicable to the sufficiency of the evidence claim underlying Petitioner's IAAC allegation is articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir. 2013) ("The clearly established federal law governing Eley's [insufficient evidence] claim was determined in *Jackson*."). Pursuant to *Jackson*, the relevant question is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Although the Superior Court did not specifically apply *Jackson* and its progeny when addressing Petitioner's underlying insufficient evidence argument, the state court decision upon which it relied refers to the applicable precedent and its decision does not contradict *Jackson*. *See Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir. 2008) (Supreme Court of Pennsylvania's decision was not "contrary to" clearly established federal law because appropriately relied on its own state court cases, which articulated the proper standard derived from Supreme Court precedent). For the following reasons, the Court also concludes that the Superior Court reasonably applied *Jackson* when concluding the sufficiency-of-the-evidence claim underlying Petitioner's IAAC Claim lacked merit.

The trial court was presented with the following evidence when considering Petitioner's MJA: (1) in the early morning hours of May 26, 2015, three men

dressed all in black with their faces covered broke into the home where Stacie, her

boyfriend, Stacie's two children, Stacie's mother Karen, and Stacie's grandmother

McAmvey lived; (2) one of the men held a gun to Stacie's head, put his face very

close to hers and asked her where the money was; (3) the men left when they heard

the police coming; (4) next to the driveway police officers found a bookbag

belonging to no one who lived in the house; (5) in the book bag were a roll of duct

tape and a stun gun; (6) Petitioner's thumb print was on the duct tape; (7)

Petitioner was included as a possible contributor to the mixed DNA profile found

on the tightening straps of the backpack;  (8) two weeks prior to the home

invasion, on May 14th, three black men had driven up the driveway to the house in

a light blue Lincoln and asked where they could buy hay; (9) McAmvey met them

and told them she did not sell hay; (10) Karen took down the license plate number

from the car, which the police learned belonged to Jennifer Brown, Petitioner's

mother; (11) on May 27th, McAmvey picked Petitioner out of a lineup as possibly

resembling the man who came to the house on May 14th; (12) officers conducting

surveillance saw Petitioner driving the blue Lincoln on May 29th; (13) during

Petitioner's retrial, McAmvey identified Petitioner as the driver of the Lincoln on

May 14th; (14) during Petitioner's retrial, Stacie identified Petitioner as having eyes

26

that looked like those of the man who held her at gun point;[11] and (15) Petitioner

left the State of Delaware and fled to Florida following the home invasion.  Trial

counsel cross-examined both Stacie and McAmvey about the weaknesses in their

identifications. (D.I. 26-4 at 73-77, 79-82)

When reviewing Petitioner's insufficient evidence argument in the context

of deciding Petitioner's IAAC Claim, the Superior Court concluded that

Petitioner's underlying challenge to the sufficiency of the evidence lacked merit,

opining:

> [Petitioner's] thumbprint was on a roll of duct tape left
> behind by the intruders when the home invasion occurred.
> The duct tape was in a backpack along with a stun gun.
> These facts come directly from the evidence and need no
> inferential help to establish. That the intruders intended to
> use these items in facilitating the crimes is an obvious
> inference without resorting to the need to view it in the
> light most favorable to the State. Further, [Petitioner's]
> presence at the crime scene 12 days earlier is established
> with scant resort to any preferential inference. The license

---

[11]Prior to Petitioner's second trial, Petitioner filed a *motion in limine* to exclude
Stacie and McAmvey from identifying him in court.  The trial court heard
testimony from both witnesses and denied the motion, finding the probative value
of the witness' identifications was not substantially outweighed by the danger of
unfair prejudice.  (D.I. 26-4 at 69)  The Delaware Supreme Court affirmed that
finding on appeal.  To the extent there were contradictions in testimony or
inferences to be made from the facts, it was squarely within the province of the
jury to make those inferences, to judge the credibility of witnesses, and to resolve
conflicts in testimony. *See Cooper v State*, 1996 WL 313501, at *3 (Del. May 31,
1996).  Consequently, once the trial court found the identifications to be
admissible, it was appropriate for that court to take them into consideration when
deciding the MJA.

> plate on the car the visitors drove that day proved that the
> car belonged to [Petitioner's] mother. The car was
> registered to an address in Wilmington that [Petitioner]
> also listed as his address, and [McAmvey] identified
> [Petitioner] as one of the occupants. [McAmvey] believed
> the incident odd. The inquiry about hay for sale made no
> sense. There was no signage anywhere advertising hay for
> sale, and the visitors' vehicle - a Lincoln - seemed
> unsuitable for hauling hay. A rational trier of fact easily
> could infer that the purpose of the encounter on May 14th
> was reconnaissance. The Court remains convinced that a
> rational   jury   could   infer   from   [Petitioner's]
> reconnaissance of the victims' residence together with his
> thumbprint on an object left at the crime scene that
> [Petitioner] was present at the scene.

*Brown*, 2019 WL 5681524, at *4.  The Superior Court further held:

> On   appeal,   [Petitioner's]   counsel   unsuccessfully
> challenged the in-court identifications of [Petitioner] by
> [McAmvey] and [Petitioner's] eyes by Stacie. He argued
> that those identifications were impermissibly suggestive
> due to the witnesses' observations of [Petitioner] during
> his first trial. The Court does not perceive either the MJA
> issue or the one raised on appeal as being particularly
> strong. When balancing the two, the Court cannot say
> [Petitioner's] issue is "clearly stronger." Both were
> unlikely to prevail.

*Brown*, 2019 WL 5681524, at *5.

In this proceeding, Petitioner relies on the Third Circuit's decision in

*Travillion v. Sup't Rockview SCI*, 982 F.3d 896 (3d Cir. 2020) to support his

argument that the Superior Court unreasonably applied *Jackson* in finding there

28

was sufficient evidence to support his conviction and in concluding that the trial

court correctly denied his MJA. More specifically, he contends:

> Just as the Third Circuit found in *Travillion* […], to allow
> Petitioner's conviction to stand on such weak
> circumstantial evidence and a single latent print found on
> an easily movable object located at the crime scene
> without evidence of when the fingerprint was made and
> without sufficiently incriminating additional circumstance
> [sic] evidence would be to hold that anyone who touches
> anything which is found later at the scene of a crime may
> be convicted.

(D.I. 2 at 43) (citations omitted) Petitioner's reliance on *Travillion* is misplaced.

In *Travillion*, the only evidence tying the petitioner to the crime scene was his

fingerprints on easily moveable objects – a manila folder and a piece of paper. *See*

*Travillion*, 982 F.3d at 904. Because there was no evidence that the folder and

paper were unavailable to the petitioner before the crime, the Third Circuit found

that Travillion's fingerprints could have been left on the objects at any point. *Id.* at

905. Applying *Jackson*, the Third Court held that, "viewing the evidence in the

light most favorable to the prosecution, and drawing all reasonable inferences from

the evidence, no rational trier of fact could have found Travillion was the

perpetrator of the crime for which he was convicted beyond a reasonable doubt."

*Id.* at 904.

In this case, there was more than fingerprint evidence linking Petitioner to

the home invasion. For instance, the DNA evidence found on the backpack

29

included him as a contributor and did not exonerate him. The backpack, left on private property, contained items suitable for use in a home invasion, including duct tape and a stun gun. A rational juror could have concluded that the backpack was not randomly left on the property but was used during the crime. *See Gov't of Virgin Islands v. Edwards*, 903 F.2d 267, 271 (3d Cir. 1990) (in upholding conviction based on fingerprints found on window louvers, noting that prints were found at the end of a dead-end road and "[a]lthough it is true that [the defendant] could have left the prints on the outside of the glass while just trespassing in the backyard, evidence need not be inconsistent with every conclusion save that of guilt, provided it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt."). Additionally, a vehicle registered to the same address as Petitioner's residence visited the property temporally close to when the home invasion occurred, and the vehicle's occupants engaged in suspicious behavior while there. A rational juror could have inferred that the individuals in the car – which included Petitioner – were casing the location. *See, e.g., United States v. Paris*, 578 F. App'x 146, 148 n.2 (3d Cir. 2014) (discussing defendant's casing a probative guilt for an attempted crime). And, finally, unlike *Travillion*, an eyewitness – Stacie – testified and placed Petitioner at the scene at the time of the home invasion.

After reviewing the aforementioned evidence in a light most favorable to the State, the Court concludes that the Superior Court reasonably applied *Jackson* in finding that Petitioner's insufficient evidence argument lacked merit. As a result, the Court also concludes the Superior Court reasonably determined that Petitioner's meritless insufficient evidence argument was not clearly stronger than the identification issue that was raised on direct appeal.

Thus, the Superior Court did not unreasonably apply *Strickland* in concluding that Petitioner failed to demonstrate that his appellate counsel's performance was deficient and in finding an absence of prejudice. To the extent Claim Two concerns a factual mater, the Superior Court reasonably determined the facts.

Accordingly, the Court will deny Claim Two for failing to satisfy § 2254(d).

### C.  Claim Three:  Actual Innocence

In Claim Three, Petitioner alleges that he is actually innocent because: (1) the eyewitness who described the perpetrator never identified Petitioner and had previously identified a third person who did not match his description; (2) the eyewitnesses were prejudiced because they were victims of a crime; and (3) the witness identifications were tainted by the suggestive first trial encounter between the victims and Petitioner.  (D.I. 19 at 10-12)

While a prisoner may assert actual innocence as a gateway for obtaining habeas review of defaulted claims, whether a freestanding claim of actual innocence is cognizable on federal habeas review remains an open question in Supreme Court jurisprudence. *See  McQuiggan v. Perkins*, 569 U.S. 383, 392 (2013); *Reeves v. Fayette SCI*, 897 F.3d 154, 160 n. 4 (3d Cir. 2018).  Even for gateway claims, "[a]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623; *House v. Bell*, 547 U.S. 518, 521, 536-37 (2006).

Assuming, *arguendo*, that an assertion of actual innocence could constitute a freestanding claim, a petitioner's burden on any such claim "would necessarily be extraordinarily high" and "more demanding" than that applied to gateway actual-innocence claims. *Herrera v. Collins*, 506 U.S. 390, 416 (1993); *see also Reeves*, 897 F.3d at 160 n.4 (describing hypothetical freestanding actual-innocence standard as "more demanding" than that applied to gateway actual-innocence claims).  To put the burden for establishing a freestanding claim of actual innocence in perspective, a gateway actual innocence claim that is asserted in an effort to overcome the statute of limitations bar for habeas cases will only prevail if it is based on "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [ ] that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

32

Here, Petitioner has not presented any facts to establish his actual innocence nor has he presented any colorable evidence of his actual innocence. Therefore, Petitioner's assertion of innocence does not satisfy the *McQuiggan/Schlup* standard. Accordingly, the Court will deny Claim Three.

### E. Claim Four: Insufficient Evidence

In Claim Four, Petitioner contends that there was insufficient evidence to support his convictions. He argues that "a conviction cannot be sustained solely on a defendant's fingerprints being found on the duct tape unless the State could establish the print could have been impressed only at the time of the crime. (D.I. 19 at 25) According to Petitioner, "[r]emoving the fingerprint evidence, and tainted eyewitness second trial identifications, no juror could have found [him] guilty beyond a reasonable doubt." (*Id.*)

As previously discussed, although Petitioner filed a motion for judgment of acquittal at the conclusion of his trial challenging the sufficiency of the evidence, he did not appeal the Superior Court's denial of that motion. Petitioner also did not raise the instant argument as an independent ground in his Rule 61 motion or on postconviction appeal. Therefore, Petitioner has not exhausted state remedies for Claim Four.

At this juncture, any attempt by Petitioner to raise the insufficient evidence argument in a new Rule 61 motion in order to appeal any adverse decision would

33

be barred as untimely under Delaware Superior Court Rule 61(i)(1) and as second

or successive under Rule 61(i)(2). *See* Del. Super. Ct. Crim. R. 61(i)(1)

(establishing a one-year deadline for filing Rule 61 motions); Del. Super. Ct. Crim.

R. 61(i)(2) (providing that second or successive motions shall be summarily

dismissed unless they meet the pleading requirements of Rule 61(d)(2)(i) or (ii)).

Although Rule 61 provides for an exception to its procedural bars if a Rule 61

motion "asserts a retroactively applicable right that is newly recognized after the

judgment of conviction is final," no such right is implicated in the instant Claim.

Similarly, the exceptions to the bars contained in Rule 61(i)(5) and (d)(2) do not

apply to Petitioner's case, because he does not allege that he has new evidence of

his actual innocence, lack of jurisdiction, or that a new rule of constitutional law

applies to the instant arguments. Therefore, Claim Four is procedurally defaulted,

which means that the Court cannot review its merits absent a showing of either

cause and prejudice or that a miscarriage of justice will result absent such review.

An attorney's error can constitute cause for a procedural default, but only if

the petitioner first presented that ineffective assistance of counsel claim to the state

courts as an independent claim and it was determined that the attorney's error

amounted to constitutionally ineffective assistance. *See Murray*, 477 U.S. at 488-

89. To the extent the Court should construe Claim Two's argument concerning

appellate counsel's failure to appeal the denial of his MJA as an attempt to

34

establish cause, it is unavailing, because the Court has already found the IAAC

argument to be meritless.  Petitioner does not assert any other cause for his default.

In the absence of cause, the Court need not address the issue of prejudice.

Nevertheless, Petitioner cannot establish prejudice because, for the reasons

previously provided regarding Petitioner's IAAC Claim, Petitioner's argument that

the State provided insufficient evidence to convict him at trial is unsupported and

without merit.  The miscarriage of justice exception also does not excuse

Petitioner's procedural default because he has not provided new reliable evidence

of his actual innocence.  Accordingly, the Court will deny Claim Four for being

procedurally barred.

### F. Claim Five:  Ineffective Assistance of Trial Counsel

In Claim Five, Petitioner contends trial counsel should have requested a jury

instruction that advised jurors to use caution when considering in-court

identifications, and he appears to view an appropriate instruction as one similar to

the jury instruction discussed in *Bey v. Sup't SCI Greene*, 856 F.3d 230 (3d Cir.

2017) and *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954).  (D.I. 19 at 17-18)

Petitioner asserts trial counsel should have objected to the instruction that was

provided on the basis that it "omitt[ed] the relevant accuracy factors and any

mention of caution, did not convey either the criteria that should be used by a jury

to evaluate suspect identification testimony, or that if such criteria were found to exist, that the testimony may be received with caution." (D.I. 19 at 19-20)

Petitioner did not exhaust state remedies for the IATC argument in Claim Five because he did not present it to the Delaware state courts in his Rule 61 motion or on post-conviction appeal. Any future attempt to exhaust the instant IATC argument would be futile under Rule 61(i)(1) and (2). Consequently, Claim Five is procedurally defaulted, which means that the Court cannot address its merits absent a showing of cause and prejudice, or a showing that a miscarriage of justice will result if the Claim Five is not addressed on its merits.

The Court liberally construes Petitioner's reference to "collateral counsel" and *Martinez v. Ryan*, 566 U.S. 1 (2012) as an attempt to establish cause for his default by blaming postconviction counsel for not raising the instant IATC Claim in his Rule 61 motion. (D.I. 19 at 17) In *Martinez*, the Supreme Court held that the inadequate assistance of counsel or the absence of representation during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel if the petitioner demonstrates that: (1) the procedural default was caused by either the lack of counsel or post-conviction counsel's ineffective assistance during the petitioner's first collateral proceeding in which the claim could have been heard; and (2) the underlying ineffective assistance of defense counsel claim is substantial

36

(*i.e.*, has "some merit").  *See Cox v. Horn,* 757 F.3d 113, 119 (3d Cir. 2014).

"[W]hether a claim is substantial is a threshold inquiry that does not require full

consideration of the factual or legal bases adduced in support of the claims." *Bey*,

856 F.3d at 238.

Here, the *Martinez* rule cannot excuse Petitioner's default of Claim Five

because the IATC allegation is not substantial.  The Superior Court instructed the

jury in Petitioner's case as follows:

> An issue in this case is the identification of the defendant
> Before you may find the defendant guilty of any crime,
> you must be satisfied, beyond a reasonable doubt, that the
> wrongful conduct in this case actually took place and the
> defendant was in fact the individual who committed the
> wrongful conduct.  If there is any reasonable doubt about
> the identification of the defendant, you must give him the
> benefit of such doubt and find him not guilty.

(D.I. 26-20 at 18)  This instruction mirrored Delaware's pattern jury instruction,

and is a correct statement of the law.  *See Goode v. State*, 190 A.2d 996 (Table),

2018 WL 3323644, at *3 (Del. Jul. 5, 2018).  Additionally, Petitioner has not

shown that the identification instruction was ambiguous, inconsistent, or deficient,

or that it relieved the State from proving Petitioner was the perpetrator of the home

invasion beyond a reasonable doubt.  *See Waddington v. Sarausad*, 555 U.S. 179,

190-91 (2009) (noting that a reviewing court should consider if there is "some

ambiguity, inconsistency, or deficiency in the instruction, such . . . that there was a

reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of providing every element of the crime beyond a reasonable doubt."). Thus, trial counsel had no reason to object to the instruction.

To the extent Petitioner relies on *Bey* and *Kloiber* to demonstrate that trial counsel provided ineffective assistance for not requesting a different jury instruction, his reliance is misplaced. In *Kloiber*, the Pennsylvania Supreme Court held that "where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify [the] defendant on one or more prior occasions," the trial court "should warn the jury that the testimony as to identity must be received with caution" ("*Kloiber* instruction"). *Kloiber*, 106 A.2d at 826-27. *Kloiber*, however, is a Pennsylvania state court decision and is not binding on a Delaware court.

In *Bey,* the Third Circuit found that the petitioner was prejudiced by trial counsel's failure to object to an incorrect version of the *Kloiber* instruction on eyewitness testimony because that version was misleading and prejudicial. *See Bey*, 856 F.3d at 241-44. Not only is *Bey* distinguishable from Petitioner's case – because the instruction in Petitioner's case was not an incorrect statement of law – but *Bey* also does not impose a requirement on trial courts to instruct juries to view identification evidence with caution.

38

Based on the foregoing, trial counsel's failure to object to the identification jury instruction does not satisfy *Martinez*'s requirements for excusing Petitioner's default of Claim Five.  In the absence of cause, the Court need not address the issue of prejudice.  Additionally, the miscarriage of justice exception does not excuse Petitioner's procedural default because he has not provided new reliable evidence of his actual innocence.  Accordingly, the Court will deny Claim Five for being procedurally barred.

## G.   Claim Six:  Conflict of Interest

Around the time of Petitioner's retrial, his original trial counsel withdrew her representation because she started a new job with the Delaware Attorney General's Office.  (D.I. 20 at 1)  In Claim Six, Petitioner appears to argue that his Sixth Amendment right to counsel was violated when the Delaware state courts denied his motion to recuse the Delaware Attorney General's Office due to his former attorney's new employment there.  According to Petitioner, his former counsel "had to reveal information [to the Attorney General's Office] about the case because it's her duty to reveal that information to her boss, information she learned from her representation of [Petitioner] at his first trial and strategies he was going to pursue at the second trial."  (D.I .20 at 4)

In 2022, Petitioner presented a substantially similar claim to the Superior Court in a "motion for recusal" of the Delaware Attorney General's Office.  (D.I.

39

18-1)  The motion for recusal asked the Superior Court to vacate Petitioner's guilty

verdicts because his original counsel took a job with the Attorney General's Office,

which Petitioner argued created a conflict of interest.  (*Id.*)  The Superior Court

treated the motion as a Rule 61 motion for postconviction relief and summarily

dismissed it as time-barred, successive, and procedurally defaulted.  *See State v.*

*Brown*, 2022 WL 5419638, at *1-2 (Del. Super. Ct. Oct. 7, 2022).  The Delaware

Supreme Court affirmed that decision "on the basis of and for the reasons stated in

the Superior Court's October 7, 2022 Order."  *Brown v. State*, 289 A.3d 276

(Table), 2022 WL 17881307 (Del. Dec. 22, 2022).

By applying the procedural bars of Rule 61(i)(1), (2), and (3), the Delaware

state courts articulated a "plain statement" under *Harris v. Reed* that its decision

rested on state law grounds.  Rules 61(i)(1), (2), and (3) are independent and

adequate state procedural rules effectuating a procedural default.  *See Washington*

*v. May*, 2022 WL 4598510, at *27 (D. Del. Sept. 30, 2022).  Therefore, the Court

cannot review the merits of Claim Six absent a showing of cause for the default,

and prejudice resulting therefrom, or upon a showing that a miscarriage of justice

will occur if the claim is not reviewed.

Petitioner does not allege, and the Court does not discern, any cause for

Petitioner's default of Claim Six.  The absence of cause eliminates the need to

address the issue of prejudice.  Additionally, Petitioner has failed to demonstrate

that a miscarriage of justice will ensue if the Court does not review the merits of Claim Six, because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Six as procedurally barred from federal habeas review.

### H. Claim Seven: Cumulative Error

Liberally construed, Petitioner's final Claim contends that the Delaware state courts and post-conviction counsel erred by "fail[ing] to consider collectively the cumulative errors of Petitioner's trial which led to the conviction of an innocent man." (D.I. 19 at 26) Those errors include "tainted identification [s], ineffective assistance of his second trial counsel, and [the State's] failure to establish the time[frame] of the fingerprints." (*Id.*)

To the extent Petitioner asserts that postconviction counsel provided ineffective assistance by failing to raise the issue of cumulative error in his Rule 61 proceeding, the Court will deny the Claim for failing to present a proper basis for federal habeas relief. There is no federal constitutional right to counsel in collateral proceedings, and freestanding claims of ineffective assistance of post-conviction counsel are not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a

41

proceeding arising under section 2254."); *Coleman*, 501 U.S. at 752; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).

To the extent Petitioner alleges a standalone cumulative error claim, he has defaulted the argument because he did not present it to the Delaware state courts, and the time to do so has passed. Petitioner does not assert any cause for his failure to properly raise the claim in the state courts. Additionally, *Martinez* does not provide an avenue for establishing cause because the *Martinez*-exception for procedural default is limited to underlying ineffective assistance of counsel claims, and does not apply to a stand-alone cumulative error claim. *See Davila v. Davis*, 582 U.S. 521, 533-34 (2017).

In the absence of cause, the Court will not address the issue of prejudice. Petitioner has also failed to demonstrate that a miscarriage of justice will ensue if the Court does not review the merits of Claim Seven, because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Seven as procedurally barred from federal habeas review.

## IV.   CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by

demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons discussed, the Court will deny the instant Petition without holding an evidentiary hearing or issuing a certificate of appealability. The Court will enter an order consistent with this Memorandum Opinion.